## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND | : | | |
| ETHICS IN WASHINGTON and | : | | |
| NOAH BOOKBINDER, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 18-76 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 12, 13 |
| | : | | |
| FEDERAL ELECTION COMMISSION, | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

<small>GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</small>

## I. INTRODUCTION

This case concerns the degree to which the Federal Election Commission ("FEC") can shield an enforcement action from judicial review by invoking its discretion to bring that action in the first place. Plaintiffs, Citizens for Responsibility and Ethics in Washington ("CREW") and Noah Bookbinder, CREW's executive director, initiated this action against the FEC under the Federal Election Campaign Act ("FECA"). They argue that the FEC improperly dismissed their administrative complaint against New Models, a non-profit entity based in Washington, D.C. According to Plaintiffs, New Models failed to register and report as a "political committee" in 2012, in violation of FECA, yet the FEC declined to investigate that violation. The FEC Commissioners charged with explaining the dismissal justified the FEC's action with a lengthy analysis of statutory text and case law. They also, however, stated that dismissal was appropriate because pursing an investigation of New Models would not be an appropriate use of the FEC's

limited resources. In other words, they invoked the FEC's "prosecutorial discretion" to decline enforcing FECA against New Models.

Pending before the Court are the parties' ripe cross-motions for summary judgment. The FEC argues, relying heavily on a recent D.C. Circuit decision, that because the Commissioners exercised prosecutorial discretion to dismiss Plaintiffs' administrative complaint, this Court is barred from reviewing any portion of that dismissal. Plaintiffs resist the application of that "magic words" standard, and the Court is sympathetic to Plaintiffs' concerns. However, having reviewed the relevant case law and the parties' briefing, the Court concludes that, at least in this case, it cannot review the FEC's invocation of its unreviewable discretion. Thus, for the reasons stated more fully below, the FEC's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.

## II. BACKGROUND

### A. Statutory and Regulatory Framework

#### 1. Federal Election Campaign Act

Congress enacted FECA, 52 U.S.C. §§ 30101–30126, to prevent money from corrupting or appearing to corrupt the positions taken by candidates for federal office, and those candidates' actions while in office. *See generally Citizens United v. FEC*, 558 U.S. 310, 370–71 (2010). In pursuit of this goal, FECA limits the amount of money that individual donors may contribute to particular types of election-related causes. *See, e.g.*, 52 U.S.C. § 30116(a)(1)(A) (stating that "no person shall make contributions . . . to any candidate and his authorized political committees with respect to any election for Federal office which, in the aggregate, exceed $2,000."). FECA also requires that certain categories of politically-inclined organizations disclose to the public

how they spend their money and—more importantly—where that money comes from.  *See id.* §
30104.

This case concerns FECA's disclosure requirements for a specific type of organization: a
"political committee."  FECA defines a "political committee" as "any committee, club,
association, or other group of persons" that receives "contributions" or makes "expenditures"
"aggregating in excess of $1,000 during a calendar year."  *id.* § 30101(4)(A).  "Contributions"
and "expenditures" are in turn defined as payments made with a purpose to "influenc[e] any
election for Federal office."  *See id.* § 30101(8)(A), (9)(A).  The Supreme Court has further
narrowed the scope of FECA's rules governing political committees, holding that they cover
only "organizations that are under the control of a candidate or the major purpose of which is the
nomination or election of a candidate."  *Buckley v. Valeo*, 424 U.S. 1, 79 (1976).  The FEC
determines a group's "major purpose" on a case-by-case basis, taking into account the group's
allocation of spending, public and private statements, and overall conduct.[1]  *See* Supplemental
Explanation & Justification, 72 Fed. Reg. 5595, 5601 (Feb. 7, 2007); *Shays v. FEC*, 511 F. Supp.
2d 19, 23, 30 (D.D.C. 2007).  Put simply, then, as it pertains to this case, an organization must
register as a political committee if: (1) it receives contributions or makes expenditures of more
than $1,000 in a calendar year for the purpose of influencing a federal election; and (2) its major
purpose is the nomination or election of a candidate for federal office.

Classification as a political committee has significant practical consequences.  FECA
requires political committees to register with the FEC, hire a treasurer, and keep records of the
names and addresses of contributors.  *See* 52 U.S.C. §§ 30102–03.  Political committees must

---

[1] This approach "has been litigated, scrutinized, and ultimately validated by a fellow
court in this District."  *CREW v. FEC ("CREW I")*, 209 F. Supp. 3d 77, 82 (D.D.C. 2016) (citing
*Shays v. FEC*, 511 F. Supp. 2d 19 (D.D.C. 2007)).

also file detailed monthly reports identifying, among other information, the amount of money

contributed to the reporting committee by individuals and other political committees, the

identities of those individuals and political committees, the amount of money contributed by the

reporting committee to other political committees, and the identities of those political

committees. *See id.* § 30104(b). And once an organization becomes a political committee, it

may only terminate its status if it "will no longer receive any contributions or make any

disbursements" and "has no outstanding debts or obligations," *id.* § 30103(d)(1), or with the

Commission's permission under certain circumstances, *see* 11 C.F.R. § 102.4. "In sum,

regulatory obligations, prohibitions, and First Amendment impingements associated with

political-committee status are weighty and extensive." Administrative Record at 99 ("AR099"),

ECF No. 21.

## 2. FECA Enforcement

The FEC (or the "Commission") protects voters' access to "information 'as to where

political campaign money comes from and how it is spent by the candidate.'" *Buckley*, 424 U.S.

at 66–67 (quoting H.R. Rep. No. 92-564 at 4 (1971)). More specifically, the Commission has the

power to "administer, seek to obtain compliance with, and formulate policy with respect to"

FECA, and its disclosure requirements. 52 U.S.C. § 30106(b)(1). The Commission is also

charged with preventing, investigating, and correcting FECA violations. *See id.* 30109(a).

FECA provides the Commission with broad investigatory powers in service of that mission,

including subpoena power and the power to bring civil actions. *See id.* § 30107. The

Commission is structurally bipartisan: of the six members, no more than three may be from the same political party. *Id.* § 30106(a)(1).[2]

FECA provides the framework by which the Commission must investigate and address FECA violations. First, as happened here, an individual or organization may file a sworn administrative complaint with the Commission asserting that a FECA violation has occurred. *See id.* § 30109(a)(1); *see also* 11 C.F.R. § 111.4.[3] Next, based on the complaint and any FEC Office of General Counsel ("OGC") recommendations, *see* 11 C.F.R. § 111.7, the Commissioners vote on whether there is "reason to believe that a person has committed, or is about to commit," a FECA violation, 52 U.S.C. § 30109(a)(2). Four votes are required to move forward with an investigation. *Id.* Thus, if a full complement of six Commissioners participate in the process, three negative "reason to believe" votes may block any investigation or enforcement action. But, as in this case, when fewer than six Commissioners participate, even fewer negative votes may block further action. If four Commissioners find reason to believe that a violation occurred or will occur, the Commission and its OGC must investigate the complaint further. *See id.* § 30109(a)(2), (3). After the investigation, the Commissioners must again vote on whether there is "probable cause to believe" that a violation occurred or is about to occur. *See id.* § 30109(a)(4). And again, four votes are required. *See id.* If the Commission determines that probable cause exists, the OGC attempts to informally and privately resolve the dispute with the alleged violator. *See id.* §§ 30109(a)(4)(A)(i)–(B)(i). If those attempts fail, the

---

[2] FECA does not require that the Commission always have the full slate of six Commissioners. The FEC actions at issue here involved only four commissioners. *See* AR087.

[3] The Commission may also take action "on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities." 52 U.S.C. § 30109(a)(2).

Commissioners must again vote—and again, four votes are required to move forward—on whether to institute a civil action in federal court. *See id.* § 30109(a)(6)(A).[4]

Congress did not stop there, however. It built into FECA a mechanism for citizens to ensure that the Commission upholds its obligation to safeguard electoral integrity. In a somewhat uncommon legislative step, Congress provided for judicial review of Commission decisions not to enforce FECA.

The review mechanism works as follows. If the Commissioners deadlock on a "reason to believe" vote, they may vote to dismiss the administrative complaint that prompted the vote. *See id.* § 30106(c) ("[T]he affirmative vote of [four] members of the Commission shall be required in order for the Commission to take any [enforcement or other authoritative] action."); *id.* § 30109(a)(1) (noting that the Commission may "vote to dismiss" an administrative complaint). At that point, as happened here, the Commissioners who voted not to proceed with the matter (the "Controlling Commissioners") must issue a statement explaining their reasons. *See CREW v. FEC ("CREW/CHGO")*, 892 F.3d 434, 437 (D.C. Cir. 2018), *petition for reh'g en banc filed*, No. 17-5049 (D.C. Cir. July 27, 2018); *FEC v. Nat'l Republican Senatorial Comm. ("NRSC")*, 966 F.2d 1471, 1474 (D.C. Cir. 1992); *Common Cause v. FEC*, 842 F.2d 436, 448–49 (D.C. Cir. 1988); *Democratic Cong. Campaign Comm. v. FEC*, 831 F.2d 1131, 1135 & n.5 (D.C. Cir. 1987). Any "party aggrieved" by the dismissal "may file a petition" for review by a court in this district. 52 U.S.C. § 30109(a)(8)(A). If the reviewing court determines that the Controlling Commissioners acted "contrary to law" in dismissing the complaint, the court must explain that conclusion and direct the Commission to "conform with such declaration within [thirty] days." *See id.* § 30109(a)(8)(C). Finally, if the Commission fails to conform to the court's order

---

[4] The statute of limitations for FECA actions is five years. *See* 28 U.S.C. § 2462.

within thirty days, the complainant may file a civil action in its own name, in federal court, to remedy the claimed violation. *See id.*

## B. Factual and Procedural Background

New Models was incorporated in 2000 as a non-profit organization with the purpose of "research[ing] national issues" and "participat[ing] in issue advocacy when appropriate." AR094. It "conducted polls, maintained a website that published information about public policy, sponsored and made available polling results and research papers, and made grants to other organizations." AR095. The Controlling Commissioners determined that from 2002 through 2015, New Models spent approximately $17.2 million. *See* AR095–96. While the specific uses of most of those funds are unclear, the parties agree that in 2012, New Models contributed approximately $3.1 million to registered political committees, nearly 70% of its spending that year. *See id.* Other than a $265,000 contribution in 2010, *see* AR095, the record does not indicate that New Models ever donated money to political committees outside of its 2012 spending. The Controlling Commissioners also concluded that New Models "never made any independent expenditures" or "ever funded any electioneering communications" directly.[5] AR097.

While New Models contributed millions of dollars in 2012 to political committees, the organization itself never registered with the FEC as a political committee. This prompted Plaintiffs to file an administrative complaint in 2014, alleging that New Models's predominantly

---

[5] An "independent expenditure" is a communication "expressly advocating the election or defeat of a clearly identified candidate" and that is made without coordinating with the candidate or a political party. *See* 52 U.S.C. § 30101(17); 11 C.F.R. § 100.16. An "electioneering communication" is a communication which "refers to a clearly identified candidate for Federal office," is "targeted to the relevant electorate," and is made within sixty days before a general election involving the candidate or thirty days before a primary election involving the candidate. *See* 52 U.S.C. § 30104(f)(3); 11 C.F.R. § 100.29.

campaign-related spending in 2012 made it an unregistered political committee.[6]  AR001–08.  In response, New Models conceded that it made over $1,000 in "contributions" under FECA in 2012, but it argued that it was not a political committee because it did not have the major purpose of nominating or electing candidates for federal office.  *See* AR051–55.  The FEC's OGC reviewed the complaint and New Models's response, and determined that "it reasonably appears that New Models made over $1,000 in expenditures in 2012 and had the major purpose of nominating or electing federal candidates."  AR065.  The OGC thus recommended that the Commissioners find "reason to believe" that New Models was a political committee.  AR066.  Nevertheless, in late-2017, the Commissioners deadlocked 2-to-2 on whether to further investigate New Models.  *See* AR087.[7]  Given the deadlock, the Commissioners voted 4-to-0 to dismiss Plaintiffs' administrative complaint.  *See* AR088.

As required, the Controlling Commissioners—the two Commissioners who voted to halt the investigation—issued a statement of reasons explaining their conclusion that there was no "reason to believe" that New Models was an unregistered political committee.  *See* AR091–122.  The statement of reasons undertook a robust discussion of New Models's activities, public statements, revenue, and spending; FECA's statutory definition of a political committee; and the evolution of the "Major Purpose Test" established by the Supreme Court in *Buckley*.  *See* AR091–108.  Given that framework, the Controlling Commissioners provided three reasons why dismissal was appropriate.

---

[6] The original administrative complaint was submitted by CREW and its then-executive director, Melanie Sloan.  *See* AR001.  CREW later amended that complaint to substitute Noah Bookbinder, CREW's current executive director and a Plaintiff here, for Ms. Sloan.  *See* AR076.

[7] The fifth Commissioner was recused and did not vote.  *See id.*  Thus, for Plaintiffs' administrative complaint to avoid dismissal, the four remaining Commissioners would have needed to unanimously agree to proceed with the New Models investigation.  *See* 52 U.S.C. § 30109(a)(2).

First, the Controlling Commissioners concluded that New Models fell outside the statutory definition of a political committee; it "was a contributor, not a political committee." AR110. More specifically, the Controlling Commissioners determined that New Models did not receive "contributions" or make "expenditures" of more than $1,000. *See* AR108–10. The Controlling Commissioners grounded this determination on the Supreme Court's reasoning in *Buckley*. They stated that the Court in *Buckley* "circumscribed" the statutory definition of "expenditure" to reach "spending that is unambiguously related to the campaign of a particular federal candidate." AR109 (quoting *Buckley*, 424 U.S. at 80). And New Models did not make "any independent expenditures of its own expressly advocating the election or defeat of a clearly identified candidate." *Id.* It only donated money to other political committees, which "made expenditures independent of candidates and political parties." AR110. In other words, the Controlling Commissioners concluded that because New Models itself did not advocate for the election of any candidate or earmark money for particular campaigns, it did not make expenditures under FECA. And because New Models did not make expenditures it could not receive contributions, which the Controlling Commissioners interpreted, under FECA and *Buckley*, to be donations "earmarked for political purposes." AR109 (quoting *Buckley*, 424 U.S. at 23 n.24, 78).

Second, the Controlling Commissioners concluded that New Models's major purpose was not the nomination or election of candidates for federal elections, as *Buckley* requires for political committee status. *See* AR121. In reaching this conclusion, the Controlling Commissioners "compare[d] New Models's isolated contributions [in 2012] with other activities both in 2012 and during its lifetime." AR111. The Controlling Commissioners acknowledged that a substantial portion of New Models's spending in 2012 consisted of donations to other

political committees, indicating that "nominating or defeating a federal candidate may have been *a* purpose of the organization in 2012." AR117 (emphasis in original). The Controlling Commissioners noted, however, that New Models spent little to no money on political committees in any other year, both before and after 2012. *See* AR095–96; AR116–18. They also surveyed New Models's public statements, organizational documents, and tax filings made over its lifetime, and could not find evidence to suggest that the organization ever advocated the election or defeat of a candidate for federal office. *See* AR111–114. The Controlling Commissioners acknowledged the possibility that New Models's purpose could have shifted in 2012, from an issues focus to a campaign focus, *see* AR117 & n.123, but they discounted that possibility given the organization's messaging and spending practices after 2012, *id.* Thus, the Controlling Commissioners concluded that New Models was an "issue discussion organization, not a political committee having the major purpose of nominating or electing candidates." AR121.

Third, the Controlling Commissioners concluded that "proceeding further would not be an appropriate use of Commission resources." AR121 n.139. They noted that New Models "appear[ed] no longer active." *Id.*; *see also* AR97 & n.32 (noting that New Models "liquidated, terminated, dissolved, or otherwise ceased operations" in 2015). They also noted "the age of the activity" at issue; the alleged expenditures occurred more than five years before the Controlling Commissioners' decision. AR121 n.139. Given these factors, the Controlling Commissioners "exercise[d] [their] prosecutorial discretion" to dismiss Plaintiffs' administrative complaint. AR121. Their discussion of prosecutorial discretion covered one paragraph of the thirty-two-page statement of reasons.

Following the Commission's dismissal of their administrative complaint, Plaintiffs filed suit in this Court alleging that the decision was contrary to law. *See generally* Compl., ECF No. 1. Plaintiffs seek a declaration that "the FEC is in violation of its statutory responsibilities under 52 U.S.C. § 30109(a)(8)" and that it acted contrary to law in dismissing Plaintiffs' administrative complaint. *Id.* ¶ 38. The parties have now cross-moved for summary judgment, and those motions are ripe for the Court's review. *See generally* Pl.'s Mot. Summ. J., ECF No. 12; FEC's Mot. Summ. J., ECF No. 13.

### III. LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Under these circumstances, where summary judgment is sought regarding . . . the FEC's dismissal decision[], this Court will grant summary judgment to the challenger only if the agency's decisions are 'contrary to law.'" *CREW v. FEC ("CREW I")*, 209 F. Supp. 3d 77, 85 (D.D.C. 2016) (quoting 52 U.S.C. § 30109(a)(8)(C)); *see also Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986). "The FEC's decision is 'contrary to law' if (1) the FEC dismissed the complaint as a result of an impermissible interpretation of the Act, or (2) if the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion." *Orloski*, 795 F.2d at 161 (citing *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31, 37 (1981); *In re Carter-Mondale Reelection Comm.*, 642 F.2d 538, 542 (D.C. Cir. 1980)). Under this standard, a court's task is "not to interpret the statute as it [thinks] best[,] but rather the narrower inquiry into whether the Commission's construction was 'sufficiently reasonable.'" *Democratic Senatorial Campaign Comm.*, 454 U.S. at 39 (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978);

*Train v. Nat. Res. Def. Counsel*, 421 U.S. 60, 75 (1975)). "Whether the FEC's decision is unanimous or deadlocks in an evenly divided vote, the same standard for judicial review applies." *CREW v. FEC ("CREW II")*, 316 F. Supp. 3d 349, 366 (D.D.C. 2018) (citing *In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000); *NRSC*, 966 F.2d at 1476).

## IV. ANALYSIS

Plaintiffs argue that the Commission acted contrary to law in two ways. First, Plaintiffs fault the Controlling Commissioners for applying an exceedingly narrow definition of "expenditure," such that only expenditures on "express[] advoca[cy]"—and not donations to political committees—were deemed relevant to whether New Models met the statutory definition of a political committee. *See* Pls.' Mem. Supp. Mot. ("Pls.' Mem.") at 29, ECF No. 12. Second, Plaintiffs characterize the Controlling Commissioners' statement of reasons as applying a "lifetime-focused test" for determining an organization's major purpose; a test that Plaintiffs claim has "been struck down as contrary to law by a judge in this district," and that otherwise has no basis in case law or FECA. *Id.* at 36.[8]

The FEC contests Plaintiffs' arguments on their merits, but it first raises a threshold challenge to this Court's review. It notes that the Controlling Commissioners expressly relied on prosecutorial discretion as "an independent basis" for dismissing Plaintiffs' administrative complaint. FEC's Mem. Supp. Mot. ("FEC's Mem.") at 15, ECF No. 13-1. And it argues that a recent D.C. Circuit opinion—*CREW v. FEC ("CREW/CHGO")*, 892 F.3d 434 (D.C. Cir. 2018),

---

[8] Plaintiffs also contend that the Court should review the Controlling Commissioners' reasoning *de novo* because that reasoning depends on the Commissioners' interpretation of case law rather than FECA, and it does not represent the FEC's official, binding position. *See id.* at 19–28. The FEC, on the other hand, advocates for *Chevron* deference. *See* FEC's Mem. at 19. Because the Court does not reach the merits of Plaintiffs' "contrary to law" arguments, it need not address this issue.

*petition for reh'g en banc filed*, No. 17-5049 (D.C. Cir. July 27, 2018)—holds that "dismissal decisions based in whole or in part on prosecutorial discretion are presumptively unreviewable." *Id.* Thus, according to the FEC, binding Circuit precedent dictates that this Court must dismiss Plaintiffs' complaint. *See id.* at 15–18. Plaintiffs raise valid reasons why *CREW/CHGO* may "allow the FEC to avoid judicial review of its actions," Pls.' Reply at 28, ECF No. 17, but they fail to demonstrate that the Circuit's decision should not govern the result here. Thus, this case begins and ends with the Controlling Commissioners' prosecutorial discretion.

*CREW/CHGO*, like this case, involved a challenge to the FEC's dismissal of an administrative complaint.[9] 892 F.3d at 437–38. The FEC dismissed the complaint because less than four Commissioners found "reason to believe" that the complaint's subject violated FECA by acting as an unregistered political committee. *See id.* at 436–37, 443. In reaching their conclusion, the "naysayers on the Commission"—the Controlling Commissioners—"placed their judgment squarely on the ground of prosecutorial discretion." *Id.* at 439. Those Commissioners "were concerned that the statute of limitations had expired or was about to; that the association named in [the plaintiff's administrative] complaint no longer existed; that the association had filed termination papers with the IRS four years earlier; that it had no money; that its counsel had resigned; that the 'defunct' association no longer had any agents who could legally bind it; and that any action against the association would raise 'novel legal issues that the Commission had no briefing or time to decide.'" *Id.* at 438. The Controlling Commissioners thus determined that the plaintiff's complaint "did not warrant further use of Commission resources." *Id.*

---

[9] CREW and its executive director were also the plaintiffs, and petitioners, in *CREW/CHGO*. 892 F.3d at 436.

In challenging that determination, the *CREW/CHGO* plaintiff raised for the Circuit the same question faced by this Court here: how closely may a court scrutinize the FEC's exercise of prosecutorial discretion in dismissing an administrative complaint?  The Circuit's answer: not at all.  *See id.* at 440.  Reaching this answer, the Circuit began with the well-established presumption that "an agency's exercise of its prosecutorial discretion cannot be subjected to judicial scrutiny."  *Id.* at 439 (citing *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)).  The Circuit noted, however, that *Heckler* establishes two circumstances in which an agency's decision not to enforce a statute is reviewable.  *See id.* at 439.  First, *Heckler*'s presumption against reviewability "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  *Id.* at 439 (quoting *Heckler*, 470 U.S. at 832–33).  Second, *Heckler* "left open the possibility that an agency nonenforcement decision may be reviewed if 'the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'"  *Id.* at 440 n.9 (quoting *Heckler*, 470 U.S. at 833 n.4).

The Circuit concluded that neither *Heckler* caveat applied to the Commission's non-prosecution decision before it.  FECA "imposes no constraints on the Commission's judgment about whether, in a particular matter, it should bring an enforcement action."  *Id.* at 439.  And the *CREW/CHGO* record "show[ed] that the Commission routinely enforce[d] the election law violations alleged in [the plaintiff's] administrative complaint."  *Id.* at 440 n.9.  Thus, the Circuit held that the Controlling Commissioners' exercise of prosecutorial discretion was not subject to judicial review, and that the plaintiff's suit was properly dismissed.  *Id.* at 440.

*CREW/CHGO* is directly on point here.  In both *CREW/CHGO* and this case, the FEC was "called upon to determine whether [an organization] . . . failed to register and report as a

14

'political committee' under the [FECA]." AR091; *see also CREW/CHGO*, 892 F.3d at 441. In each case, less than four Commissioners voted to "find[] reason to believe that [the organization] violated the Act" in the manner asserted. AR092; *see also CREW/CHGO*, 892 F.3d at 438, 443 (Pillard, J. dissenting). And in each case, the FEC dismissed the administrative complaint, prompting a lawsuit. *See CREW/CHGO*, 892 F.3d at 436–47; AR121. In reaching the decision at issue in *CREW/CHGO*, the Controlling Commissioners "placed their judgment squarely on the ground of prosecutorial discretion." *Id.* at 439. Likewise here, the Controlling Commissioners argued that dismissal was appropriate, in part, "in exercise of [their] prosecutorial discretion." AR121. They concluded that "[g]iven the age of the activity"—the expenditures at issue occurred in 2012, the administrative complaint was filed in late-2014, and the Commission dismissed the complaint in late-2017—"and the fact that the organization appears no longer active"—IRS records indicated that New Models ceased operations in 2015—"proceeding further would not be an appropriate use of Commission resources." AR097 & n.32; AR121 & n.139. Under binding Circuit law, that conclusion is not subject to judicial review. *See CREW/CHGO*, 892 F.3d at 440.[10]

A perceptive reader may, at this point, be contemplating what appears to be a key difference between *CREW/CHGO* and this case: the Controlling Commissioners' decision at issue in *CREW/CHGO* was primarily, if not solely, an exercise of prosecutorial discretion, *see id.* at 439, while the Controlling Commissioners' decision at issue here involved a robust

---

[10] This Court, in its decision reviewed by the D.C. Circuit in *CREW/CHGO*, acknowledged the FEC's broad prosecutorial discretion, but it reviewed for reasonableness the Controlling Commissioners' invocation of that discretion. *CREW v. FEC*, 236 F. Supp. 3d 378, 390–97 (D.D.C. 2017). If this Court were to apply that same degree of scrutiny here, it may, perhaps, reach a different result, given that the Controlling Commissioners relied so heavily on their legal analysis. But CREW appealed this Court's decision and wound up with *CREW/CHGO*'s seemingly more deferential standard, which this Court is now bound to apply.

interpretation of statutory text and case law, with a brief mention of prosecutorial discretion sprinkled in, *see* AR091–122. Surely, the reader may protest, a one-paragraph discussion of prosecutorial discretion cannot prevent a court from addressing thirty pages of seemingly reviewable legal analysis. Judge Pillard raised this same issue in her *CREW/CHGO* dissent. *See* 892 F.3d at 449 (Pillard, J. dissenting) ("Where the FEC makes a determination about the law in finding no 'reason to believe,' we may review the dismissal."); *id.* at 452 ("I read the Controlling Commissioners as having held a clear but incorrect view of the law that informed their dismissal. That decision should have been reviewed, reversed, and remanded to the FEC."). *CREW/CHGO* appears, however, to squash this approach. Rejecting the notion that a court may "carv[e] reviewable legal rulings out from the middle of non-reviewable actions," the Circuit held that "even if some statutory interpretation could be teased out of the [Controlling] Commissioners' statement of reasons, the dissent would still be mistaken in subjecting the dismissal of [the plaintiff's] complaint to judicial review." *Id.* at 441–42 (citations omitted). Thus, because the Controlling Commissioners here invoked prosecutorial discretion in dismissing Plaintiffs' administrative complaint—a "non-reviewable" action under *CREW/CHGO* —this Court cannot evaluate the "reviewable legal rulings" contained in the Controlling Commissioners' statement of reasons.

Plaintiffs strain, unsuccessfully, to extricate this case from *CREW/CHGO*'s holding. They argue that the Controlling Commissioners' "'terse' invocation of discretion . . . does not meet the agency's obligations [to] adequately explain its justifications to enable judicial review." Pls.' Mem. at 26 (citations omitted). In other words, Plaintiffs ask this Court to review, and reject, the Controlling Commissioners' reasons for exercising their prosecutorial discretion. But again, *CREW/CHGO* dictates the Court's response. The Circuit's opinion addressed the seeming

contradiction raised by Plaintiffs' argument: "an agency has 'absolute discretion' when it comes to enforcement decisions," yet Plaintiffs claim that "it is up to the court to decide whether the agency abused [that] absolute discretion" in deciding not to pursue enforcement.  892 F.3d at 440–41.  The Circuit rejected that contradiction, holding that "agency enforcement decisions, to the extent they are committed to agency discretion, are not subject to judicial review for abuse of discretion."  *Id.* at 441.  This Court cannot evaluate, then, the "individual considerations the [C]ontrolling Commissioners gave" in invoking prosecutorial discretion here, terse as they may be.  *Id.*[11]

Plaintiffs also see a glimmer of hope in *CREW/CHGO*'s statement, made in a footnote, that "[t]he interpretation an agency gives to a statute is not committed to the agency's unreviewable discretion."  892 F.3d at 441 n.11 (citing *Heckler*, 470 U.S. at 833 n.4).  Plaintiffs argue that the Controlling Commissioners here "definitively resolved New Models's political committee status in the negative," a legal analysis that even *CREW/CHGO* acknowledges is reviewable.  Pls.' Reply at 27.  But as discussed above, *CREW/CHGO* holds that the Controlling Commissioners' legal analyses are reviewable only if they are the *sole reason* for the dismissal of an administrative complaint.  The *CREW/CHGO* footnote quoted by Plaintiffs reflects this holding; it states that "there may be such [judicial] review under FECA if . . . the agency's action was based *entirely* on its interpretation of the statute."  892 F.3d at 441 n.11 (emphasis added).

---

[11] And if, as Plaintiffs claim, the Court *could* evaluate the Controlling Commissioners' reasons for invoking prosecutorial discretion, the Commissioners' factual bases for their decision are generally considered rational.  *See* AR121 n.139 ("Given the age of the activity and the fact that the organization appears no longer active, proceeding further would not be an appropriate use of Commission resources."); *see also Nader v. FEC*, 823 F. Supp. 2d 53, 65–66 (D.D.C. 2011) (deferring to the FEC's invocation of prosecutorial discretion when a challenged organization was "essentially defunct" and an investigation would "encounter difficulties with obtaining relevant documents and stale witness memories" (citations and internal quotation marks omitted)).

And while courts may review agency enforcement—or non-enforcement—policies that are based on the agencies' "view of what the law requires," *NAACP v. Trump*, 315 F. Supp. 3d 457, 467 (D.D.C. 2018) (citation omitted), the Controlling Commissioners' invocation of prosecutorial discretion here did not rely on their interpretation of FECA or case law. *See* AR121 n.139.[12] That invocation, brief as it was, thus insulated the Controlling Commissioners' decision from reviewability under *CREW/CHGO*.[13]

Resigning themselves to *CREW/CHGO*'s binding effect, Plaintiffs next argue that the Controlling Commissioners' decision here falls outside *Heckler*'s presumption of non-reviewability. Plaintiffs contend that the Controlling Commissioners' decision reflects a reviewable "abdication of [their] statutory responsibilities." Pls.' Reply at 29 (quoting *CREW/CHGO*, 892 F.3d at 440 n.9)). Plaintiffs' theory appears to be two-pronged: either (1) in

_____

[12] Had the Controlling Commissioners invoked prosecutorial discretion based on their legal analysis—for instance by concluding that the FEC's resources should be deployed elsewhere because the agency's action was unlikely to succeed, *see, e.g.*, *La Botz v. FEC*, 61 F. Supp. 3d 21, 33 (D.D.C. 2014), or that CREW's administrative complaint raised fair notice or due process concerns, given the agency's previous interpretations of the political committee rules, *see, e.g.*, *Campaign Legal Ctr. v. FEC ("CLC")*, 312 F. Supp. 3d 153, 158, 164–66 (D.D.C. 2018)—the Court, perhaps, could undertake a more piercing review.

[13] Plaintiffs also reference one case decided after *CREW/CHGO* in which a court in this jurisdiction reversed and remanded the FEC's dismissal of an administrative complaint, despite the Controlling Commissioners' invocation of prosecutorial discretion. *See CREW II*, 316 F. Supp. 3d at 421–22. That case, however, concerned an FEC non-enforcement decision "predicated on an invalid [FEC] regulation." *Id.* at 422 n.57. The FEC exercised its prosecutorial discretion "as a prudential matter" because the complaint's subject "could raise equitable concerns about whether [it] ha[d] fair notice" that it was subject to the FECA provision at issue, given the regulation's text. *Id.* at 363. In vacating the regulation and reversing the FEC's dismissal, the court noted that "for years" the FEC had acknowledged a material discrepancy between the regulation at issue and FECA "without remedial action"; a position "raising the issue whether the FEC had intentionally 'abdicated . . . its statutory responsibilities.'" *Id.* at 421–22. The Controlling Commissioners' decision at issue here was not based on an invalid regulation, nor did they invoke fair notice concerns, and as discussed below Plaintiffs have failed to show that the FEC abdicated its FECA responsibilities in dismissing Plaintiffs' administrative complaint. *CREW II* is thus inapposite.

dismissing Plaintiffs' complaint the Controlling Commissioners adopted a bright-line rule

"refus[ing] to apply the FECA's political committee laws to any group that qualifies under the

statute as a result of its contributions to other political committees, or as the result of an analysis

of less than its lifetime of spending"; or (2) the Commission has "'consciously and expressly

adopted a general policy' of nonenforcement" of FECA. Pls.' Reply at 29. Neither prong holds

up under scrutiny.

First, the administrative record does not support Plaintiffs' assertion that the Controlling

Commissioners adopted bright line rules here. The Controlling Commissioners evaluated New

Models's 2012 "spending on political activities," and determined that New Models did not make

FECA "expenditures" in that year. *See* AR109–10. Likewise, applying the FEC's case-by-case

approach to political committee determinations, *see* AR106 (citing 72 Fed. Reg. at 5,601–02),

the Controlling Commissioners evaluated New Models's 2012 "campaign spending" and

compared those "isolated contributions with other activities both in 2012 and during [New

Models'] lifetime," concluding that New Models did not have the major purpose of nominating

or electing candidates for federal office.[14] AR111. The Controlling Commissioners did not

indicate that their decision regarding New Models would dictate their decisions regarding other

organizations.[15] In fact, the Controlling Commissioners expressly rejected the imposition of

---

[14] And contrary to Plaintiffs' argument, the Commissioners did not ignore New Models's 2012 spending. *See* AR115 n.114 (evaluating whether New Models's 2012 spending indicated a "fundamental change" in the organization, from one focused on public policy discussion to one focused on nominating or electing federal candidates); AR117 n.123 (concluding that "New Models's spending after 2012 [does not] indicate a shift in the organization's spending pattern").

[15] The reasoning of the two Controlling Commissioners "who voted against investigation constitutes the agency's reasoning for *this* case," *Campaign Legal Ctr. v. FEC ("CLC")*, 312 F. Supp. 3d 153, 166 (D.D.C. 2018) (emphasis in original) (citing *NRSC*, 966 F.2d at 1476), but "not . . . binding legal precedent or authority for future cases," *Common Cause v. FEC*, 842 F.2d 436, 449 n.32 (D.C. Cir. 1988) (noting that the statement of reasons of three Controlling Commissioners "would not be binding legal precedent or authority for future cases. The statute

bright line rules in the political committee context. *See* AR119–21 (discarding what the Controlling Commissioners' characterized as the OGC's attempt to create a "rigid calendar year approach," in favor of their own "case-by-case framework" allowing for an analysis of an organization's spending over time). While the Controlling Commissioners' interpretation of "expenditure" under FECA may be overly narrow, it is the interpretation of only two Commissioners. It cannot control the FEC's actions unless it is adopted by more Commissioners. *See Campaign Legal Ctr. v. FEC ("CLC")*, 312 F. Supp. 3d 153, 166 (D.D.C. 2018) (declining to review a standard applied by three Commissioners, because "the Commission has yet to formally adopt it"). It thus cannot amount to an abdication of the FEC's responsibility to enforce FECA. *Heckler*, 470 U.S. at 833 n.4.

Second, Plaintiffs fail to show that the Commission has adopted a policy of FECA nonenforcement. Plaintiffs claim that this alleged policy is "reflected in years of complaints against groups who failed to register as political committees being dismissed by these [C]ontrolling [C]ommissioners, even where the FEC's staff recognizes the complaints are meritorious." Pls.' Reply at 29. And they put forth a chart purporting to show that the Commission consistently declines to find reason to believe that an organization acted as an unregistered political committee. *See* Decl. Stuart C. McPhail Ex. 2, ECF No. 17-3.

This evidence indicates that the Commission may be less zealous in enforcing FECA than Plaintiffs would like, but it does not rise to the level of showing that the Commission has consciously or expressly adopted a policy of refusing to pursue complaints against alleged unregistered political committees. *See CREW II*, 316 F. Supp. 3d at 422 (holding that the FEC

---

clearly requires that for any official Commission decision there must be at least a 4–2 majority vote."). Thus, "[a]lthough the Commission may apply the standard in the future, it may also choose to alter it." *CLC*, 312 F. Supp. 3d at 166.

may have abdicated its statutory responsibilities when "for years" it acknowledged material discrepancies between a regulation and FECA, but failed to correct those discrepancies). Rather, Plaintiffs' chart just as likely lists a series of "single-shot" non-enforcement decisions, based on various rationales. *See OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (stating that "an agency's adoption of a general enforcement policy is subject to review," while a "single-shot non-enforcement decision" is not (quoting *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994))); *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agriculture*, 7 F. Supp. 3d 1, 12–13 (D.D.C. 2013) (rejecting the plaintiff's argument that a reviewable enforcement policy was established by a "slew of incidents where [agency] officials repeatedly responded to complaints about avian abuse by" disclaiming agency jurisdiction, when the plaintiff could not "identify any concrete statement from [the agency] announcing" the alleged policy); *see also CREW/CHGO*, 892 F.3d at 438 (upholding the FEC's decision to dismiss an administrative complaint—one of the dismissals listed in Plaintiffs' chart—where the Controlling Commissioners determined that the organization named in the plaintiff's complaint was defunct, judgment-proof, and no longer had agents who could legally bind it). And as the FEC notes, in *CREW/CHGO*, the D.C. Circuit was presented with a very similar chart, yet rejected the notion that the FEC has abdicated its responsibility to enforce FECA's rules governing political committees. *See CREW/CHGO*, 892 F.3d at 440 n.9; FEC's Reply Ex. 2, ECF No. 20-2.

Without stronger record evidence indicating that the FEC has adopted a general non-enforcement policy, the Court must assume that the Commission made each decision listed in Plaintiffs' chart on a case-by-case basis. *See* 72 Fed. Reg. at 5601; *CLC*, 312 F. Supp. 3d at 164 n.6 (rejecting the plaintiff's argument that the FEC abdicated its statutory responsibilities when

"a three-Commissioner bloc . . . increasingly voted in lockstep to thwart enforcement of campaign finance law," because the "fact that these deadlocks occur is evidence of the Congressional scheme working, not malfunctioning"); *cf. Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007))). The Commission fulfilled its statutory responsibility to investigate New Models, *see* 52 U.S.C. § 30109(a), it simply reached a different conclusion than Plaintiffs preferred. That is not the "abdication" of responsibilities contemplated by *Heckler*.[16]

*          *          *

FECA expressly authorizes judicial review of the Commission's enforcement and non-enforcement decisions. *See* 52 U.S.C. § 30109(a)(8). In conducting this review, courts must balance, on the one hand, the Commission's non-reviewable judgment of how to best allocate its resources to pursue FECA violations, and on the other hand, the courts' role as "a necessary check against arbitrariness" when the "Commission is unable or unwilling to apply settled law to clear facts," *Democratic Cong. Campaign Comm.*, 831 F.2d at 1135 n.5 (internal quotation marks omitted). *CREW/CHGO* appears to shift the balance decidedly towards the Commission. Nonetheless, this Court is bound by that Circuit precedent. Here, the Controlling Commissioners declined to move forward with Plaintiffs' administrative complaint, at least in part, on the basis of prosecutorial discretion. *See* AR121 & n.139. That decision is "unreviewable." *CREW/CHGO*, 892 F.3d at 438. And because the Controlling Commissioners invoked

---

[16] In addition, Plaintiffs have failed to show that the alleged non-enforcement policy was "*consciously*" or "*expressly*" adopted. *Heckler*, 470 U.S. at 833 n.4 (emphasis added).

prosecutorial discretion, the Court is also foreclosed from evaluating the Controlling

Commissioners' otherwise reviewable interpretations of statutory text and case law. *Id.* at 441–

42. Thus, Plaintiffs' complaint must be dismissed.

## V. CONCLUSION

For the foregoing reasons, the FEC's Motion for Summary Judgment (ECF No. 13) is

**GRANTED** and Plaintiffs' Motion for Summary Judgment (ECF No. 12) is **DENIED**. An order

consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 29, 2019                                   RUDOLPH CONTRERAS
                                                        United States District Judge